Good morning, ladies and gentlemen. Our first case for argument this morning is B.G. v. Jackson. Ms. Graves. Thank you. Good morning, Your Honors. May it please the Court, I am Maureen Graves. I represent B.G. and his mother, J.A.G. This is the first forum in which CPS has tried to answer in any detail appellant's IEE, Independent Educational Evaluation, claims. And I hope it will become clear, if it hasn't already, that CPS has not responded adequately. This case is unlike most cases under the Individuals with Disabilities Education Act in many ways, chiefly three. First, in most IDEA cases involve challenges by parents to a student's educational program. Under Schaeffer v. Wiest, in those cases, parents bear the burden of proving that the district's program was inappropriate. This is a different kind of case. It involves a part of the statute which specifically allows school districts to avoid funding an independent educational evaluation if the district files for hearing in which it has the burden of proof and shows that its assessments were compliant with the law and regulations were appropriate. Second, this case is unusual in that it involves very clear, specific regulations. Most IDEA cases involve somewhat nebulous issues of how much educational benefit is enough. This case involves very clear regulations, which courts are very well suited to enforcing. And in this particular case, where district representatives admitted many errors in their administration, no educational expertise is required to resolve these matters. Third, there has been enormous confusion about what standards have been applied below. I would rather defer talking about that until after responding to questions, and also I would like to get right away to why this case is important. This family's simple request for a legally compliant independent educational evaluation has culminated so far in a published decision that eviscerates independent educational evaluation rights for any student whose adjudicator is convinced by this approach. Basically, it creates a situation in which students can only get publicly funded evaluations if they first get a privately funded or pro bono evaluation. CPS does not deny that this is the result. CPS embraces this result. The effect is that the leveling of the playing field that IEE rights are supposed to create has been negated. The decisions below destroy IEE rights that Congress, the Department of Education, and the Supreme Court deemed critical in five separate ways. First, BG stands for the proposition that although districts have the burden of proof in IEE cases, they can win even if they don't put on any testimony that their assessments complied with applicable regulations. Typically, these cases involve sort of a litany of we chose appropriate tests, we did them right, and so on. In this case, CPS did not even put on that kind of evidence, yet it won. Second, BG, as decided so far, stands for the proposition that although districts have the burden of proof in IEE cases, they can win even if staff admit that they decided not to assess in or report on all areas of suspected disability, admit they did not follow test manuals, admit they don't know where their behavioral data came from, admit disregarding Illinois State Board of Education assessment guidelines. And they can win after making those admissions even if not a single assessor or any other witness says that those errors considered in combination were harmless. Third, this case suggests, although the district court somewhat sidestepped this issue, that independent assessors and witnesses can be found unpersuasive precisely if they're independent, if they do not have an Illinois public educator license. The only reason one would need such a license is to work in an Illinois public school, and yet this case indicates that if someone does not have that license, they cannot be a court or hearing officer is entitled to entirely dismiss their testimony. Fourth, this case stands very strongly for the proposition that in order to get an IEE, you first have to get an IEE. Could you use real words instead of acronyms? Yes, I'm sorry. It would help us understand what you're saying. Okay, I'm sorry. Yeah, this case stands for the proposition that in order to get an independent educational evaluation, the parent first has to have their experts conduct an independent educational evaluation. It's not enough to have witnesses who testify about what areas the student needed to be assessed in, what disabilities were suspected, or how assessments were done wrong. It is necessary, actually, for the expert who criticizes the district evaluation to have already done their own evaluation. There are actually arguments that someone who only has access to district records is ideally suited to criticize a district evaluation, but here the student's witnesses were totally disregarded in part because they had not themselves already assessed the student. And fifth, CPS offered no witness for its narrow approach to psychology, yet the hearing office and the district court accepted that psychologists do not involve themselves with issues of language. Of course they do. There's verbal IQ. That's a large part of what educational psychologists look like. Psychologists also do visual closure testing that's relevant to identifying whether students have learning disabilities affecting reading. So the court said that psychology was very narrow and excluded students' experts in part on that basis, but then also excluded them regardless of what they said about anything. Of course only a tiny percentage of students ever try to access IAE rights, but parties try to access independent educational evaluation rights. Very few students ever do that. How would they do that? How would they do that? Well, basically a student writes a letter disagreeing or makes a written statement that they disagree with the district's assessment. They don't have to say why. They don't have to know what's wrong with it. They just say, I disagree. I want an independent educational evaluation. And in Illinois... A parent does that. Right. And in Illinois, if a parent does that, the district has to either grant that independent educational evaluation or file for hearing within five days and attempt to prove that the district assessment was appropriate. So that's how procedurally you invoke that right. Did they do that? A few parents do. I don't know how many are requested annually, but some parents do. That's what the parent did in this case. The parent, through counsel, requested an independent evaluation and gave more specific reasons than were required to do that. Then CPS initiated a hearing in which basically they just said our assessments are appropriate. We filed for hearing. And that was the only showing that they had to make at that point, or the only claim they had to make at that point. So even though few students use this process, other assessors and parties act in the shadow of the law. So assessors now know, if they believe this decision is likely to be followed, that very poor assessments will pass muster. CPS's lawyers now know that even if their assessments are quite defective, parents are not going to be able to get independent assessments. And that creates an incentive for CPS to do quite limited assessments. In this case, if CPS had done an adequate assessment, that assessment would have noted that the student's IQ had dropped quite dramatically. It would have noted that he started out almost average in math and had learned almost nothing in five years in special education. It would have noted that he had been getting multisensory reading instruction or some facsimile of it for approximately one month, five years after entering special education. So even a decent district assessment would have helped level the playing field. But that was not provided here, and yet CPS won. When did his father die? In one place the record says April, one place says May 2014. I forget which is the right month. Fourteen? Fourteen, right. And he was assessed starting in September 2014. So before that time he was living with his father? Yes, for several years. And then his mother, after the father's death, didn't have adequate housing, so the children temporarily, or two of the children temporarily lived with a... And she doesn't speak English. Correct. There's a lot of time and effort put into this by the school, a lot of different people. You know, I think the problem, I think that was what the district court basically felt, and the hearing officer as well, that a lot of people spent time on this. But, you know, if you have many defective components and you put them together, you're not going to get a working computer. I mean, no one of these assessments was done correctly. And I think in various cases it was assumed that there were corroborating documents when there weren't. So, for example, the district court thought that there was other information supporting the validity of the IQ testing. There was just one IQ test. That was the WISC-IV. There was not any other evidence that that IQ test was accurate. Similarly, the BASC rating, the teacher ratings, in which extreme caution should have been reported because of the extremely negative responses, the hearing officer in court said, yeah, but there was other information as well. That other information pointed almost entirely in the same direction, that this was a student who still had signs of ADHD. So it's not like looking at the entire record made these problems go away. Looking at the entire record confirms that the district needed to assess for ADHD, for example, and failed to do so. I'd like to talk about some of the legal and factual errors that the court made, ones that I think are primary. If you don't have more questions now. I think the first legal error was that the court erred in thinking that assessors need not try to identify disabling conditions. The court accepted the hearing officer's view that labels do not matter at all. And labels can matter. They're often used in the decisions of this court. They're often used in checking research to find out what programs are likely to actually be effective with students. Labels are obviously not the dispositive of what a child needs, but they are a very good starting point for identifying interventions. And there are specific legal requirements, for example, for assessing students with learning disabilities. There are specific cautions required in IQ testing if a student has a speech-language impairment. So these labels are important. Secondly, the court erred legally in thinking that it did not matter if assessors violated specific regulations so long as the hearing officer deemed the assessments thorough enough. And so there was kind of this, well, they did a lot of stuff. It must have been enough, without looking at the rules, which required them to do the assessments correctly in accordance with the publisher's instructions. The hearing officer erred legally in thinking that the parents had to prove that a correctly done assessment would yield a different result. And she disregarded Goldstein's testimony in part because he could not firmly say that if you used a non-verbal IQ test or a test with appropriate cautions that you would get different results. The district court sort of sidestepped that and said, well, the hearing officer didn't rely on Goldstein's testimony anyway. But the fact remains that the hearing officer was requiring students to meet a burden that the student doesn't have. The student, the district had the burden of proof in this case to show that it had complied with the law and done proper assessments. And it admitted that it hadn't done that. Fourth, the court erred legally in suppressing all of one side's evidence for reasons that had nothing to do with Dauber or with indicia of reliability because the student's assessors, student's experts had not already done their own assessments. I'm almost out of your rebuttal time, you understand. It's still green. I'm out of rebuttal time? Did you see the clock? I have a minute and 45 seconds total remaining. I'll stop. Oh, I'm sorry, I was looking at those lights. Thank you, Ms. Graves. Ms. Paschal-Lebrown. Good morning, Your Honor. In a word, I'd say that the district court clearly got this right. There are two issues on appeal. You have a low, well-modulated voice. Could you raise it a little bit? Yes. I said the district court got this right. The two issues before the court are a motion to supplement the record. The district court properly denied that motion because admitting the evidence that plaintiffs presented to the district court for admission into the record would have transformed the district court's review of the administrative decision into a new trial, and that's impermissible. So the district court properly excluded the evidence plaintiffs requested and did not abuse its discretion in making that ruling. Second issue before the court is whether the district court properly denied the plaintiff's motion to reverse the hearing officer's determination that the assessments done by the school district were appropriate. That determination made by the district court was also correct. The district court had to give due weight to the decisions of the administrative agency, which has the educational expertise that the district court did not. The district court determined that there were no legal errors made by the hearing officer, and the district court determined that the hearing officer's factual determinations were appropriate and there was no clear error. For that reason, under the standard that the district court uses, which is a preponderance of the evidence giving due weight to the determinations of the administrative agencies, the district court properly denied the motion to reverse. Now I'd like to further explain the two conclusions that I've just described. The first is the district court's decisions not to admit additional evidence. Initially, I'd note that that's an evidentiary ruling, obviously, of the district court, and evidentiary rulings are reviewed for an abuse of discretion. In reviewing administrative decisions, the district court, in an IDEA case, is allowed to permit new evidence into the record, but that's not the default. The default is the administrative record. The district court is encouraged not to admit additional evidence where doing so would transform the hearing, and in this case, there were two types of evidence that plaintiffs wanted the district court to add to the record. The first were individual educational assessments, new ones, individual educational assessments that plaintiffs did not even get until after the hearing was over. Where would those come from? Those were prepared by experts employed by the plaintiffs subsequent to the hearing officer's ruling that the assessments done by the school district were appropriate. So after that determination was made regarding the appropriateness of the school district's assessments, plaintiffs went out and got individual educational assessments, which if they were relevant at all, they would have been relevant to the determination that was before the hearing officer, and plaintiffs getting them post-hearing did not give the hearing officer an opportunity to look at those independent educational evaluations or assess them in any way. So for that reason, the hearing officer didn't pass on the new individual educational assessments, and for the district court to have considered them would have transformed its review into a new trial because it would have had wholly new evidence on which to base a determination regarding the appropriateness of the school district's assessments. Typically where new evidence is admitted by a district court, it's because in one of the very cases plaintiffs cited, there was about a year-and-a-half delay between the time of the administrative hearing and the district court's review. The needs of the child had changed during that subsequent period, so there was additional information that was admitted into the record in order to update the court on what the child needed. So these individual educational assessments that the plaintiff wanted to admit would have just simply transformed the whole review process into something that it's not supposed to be, and it would not allow the district court to do its job, which was to determine by a preponderance of the evidence whether or not the hearing officer's determination of the appropriateness of the district court's assessments was valid based on the evidence before the hearing officer, giving due regard to it. The other piece of evidence that the plaintiff sought to have admitted was an instruction manual for one of the tests, and that piece of evidence, unlike the new individual educational assessments, was actually presented to the hearing officer. When the manual was presented for admission to the hearing officer, the hearing officer excluded it. So when that issue came before the district court, the district court's duty was to determine whether the hearing officer had abused its discretion in making the evidentiary ruling that it should exclude the manual. The district court properly determined that the hearing officer did not abuse its discretion in excluding the manual, and the district court also excluded the manual appropriately for that reason because it didn't add anything. There was no testimony in the hearing that the test that the manual governed was improperly administered. The only evidence plaintiff cites for that position is the new individual educational assessment that was post-hearing, which she can't even rely on to challenge the evidentiary ruling that was made by the hearing officer relative to the manual. And so the district court and the hearing officer in the administrative proceeding properly excluded that manual. Now I'd like to turn to the district court's denial of plaintiff's motion to reverse the hearing officer's determination. So the first issue is the standard of review. At the appellate court level, a district court's ultimate determination in an IDEA case is de novo, but that's a two-part review. The appellate court looks at the district court's determinations of law for legal error, and it looks at the district court's factual findings for clear error. So if I just make a quote from one of the Seventh Circuit cases, Joe v. Board of Education, whether a school district has satisfied the requirements of the IDEA is a mixed question of fact and law, which court reviews de novo. Absent a mistake of law, the court must review the district court's decision for clear error. So plaintiffs claim that the entirety of this court's review is de novo is simply wrong. And in the district court level, the burden of proof and the standard of review is also questioned by the plaintiffs. Well, the district court's duty was to make an independent determination regarding the hearing officer's decision based on the preponderance of the evidence. And because of the expertise that is available to the hearing officer, the Congress has stated that even though the district court makes an independent decision about the hearing officer's determination, it does so giving due weight and due regard to all the decisions made at the administrative level. It is not the purview of the district court to simply substitute its decisions or its notions of educational policy for the determinations made at the administrative level. So here, where appropriate, the district court properly deferred to the evidentiary, factual, and credibility determinations that were made by the hearing officer, and it did so correctly. For example, relative to the district's assessors, their individual qualifications, both the hearing officer and the district court went through great detail regarding the training and experience and knowledge of those assessors. They talked about the fact that the assessors had used each of them, a variety of tools to evaluate the child in this case. In addition to formal tests, they used informal tests. They also observed the child in a variety of settings, in the classroom, in hallways, at home, in gym class. They also did interviews with the child, with his mother, and with his teachers, and they looked at all the records, past records of the child's evaluation. So when the plaintiff claims that there was no knowledge by the district assessors, that's completely not supported by the record, and the one and only case the plaintiff cites, which was Seattle v. BS, to say that there weren't knowledgeable assessors in that case, the reason the assessors weren't deemed knowledgeable was because none of them, none of them, knew anything about the disorders that were affecting the child. Here, as the hearing officer found and as the district court found, all of the assessors were very well trained, had a lot of experience and knowledge about the particular disorders that this child had. So the assessors in our case were completely qualified to determine and make the evaluations that they did, and importantly, as a result of their training and knowledge and experience, they were able to provide the IEP, Individual Educational Program, team with useful and comprehensive assessments that, considered together with all the other information provided, the team enabled the team to produce an individual education program for the child that was completely appropriate and is not being challenged in this case. So basically, they baked a good cake, and all the ingredients that went into it, like the assessments, were good. Otherwise, the cake would have fallen in the oven. Where is he now? Currently, he is at a CPS high school. What does that mean, CPS high school? A district high school. Okay, so he's at a regular high school. A regular high school, and he's getting multisensory services, and basically in each area where the district assessed him, he is getting services. I think the only exception is the physical therapy, because he is able to function and get around without physical therapy services. But in all the other areas that were tested by the district and recently tested, again, he is receiving all the services that were assessed. What's his reading level now? That I couldn't tell you. But he's in high school. He is in high school. So under applicable law, getting back to the validity of the assessments that were made by the district back in 2014, under the law, plaintiff emphasizes the rules governing the assessments, but basically it comes down to this. Assessments are only inappropriate if they're not conducted in the appropriate language for the child, if they're prepared by untrained or unknowledgeable assessors, which I've already dealt with, if they're not based on formal tests and other evaluation tools, which clearly as the district court detailed, all of the assessors performed formal tests as well as other evaluation tools, and an assessment may be inappropriate if it fails to test for appropriate areas. And in this case, all of the appropriate areas were tested for. When the plaintiff mentioned the ADHD, for example, and the district not assessing for that particular disorder, the district didn't assess formally for that particular disorder because there was no indication of that being a disorder with a child. Schools are not required to test every and any possible disability that may exist just because a child presents as having a potential disorder. What the law requires is that the district assess in each area where there's a suspected disability, and there was nothing in this child's record of a suspected ADHD disability, and plaintiff's experts confirmed that. And the hearing officer found that there was also no diagnosis by a medical doctor of ADHD. The cases plaintiff cites where ADHD was an issue that the district in those cases didn't test was because in those cases, the district had been provided with an outside opinion from a medical doctor or otherwise that the child in those cases did potentially suffer from ADHD. So the district's failure in those cases to assess for it was significant. Here, there is no testimony and nothing in the record before the IEP team that suggested that the child needed to be tested for ADHD, and the district didn't formally do so for that reason, and plaintiff's expert agreed. There was no indication in the record that ADHD was a problem. And when plaintiff talks about issues like not thoroughly testing for emotional disability, that also is incorrect. That was precisely tested for, and it was found to exist in this child, and the child did get emotional disability-related services. And relative to the comments about the school district's sort of dismissal of the importance of labels, that didn't happen at all. The testimony before the hearing officer showed that in certain situations, either the assessors weren't able to administer tests because the child was either uncooperative and also because of issues like his significant depression and emotional disabilities and his absences from school, because of those large absences, it's difficult to determine whether or not there's a learning disability. So they're not going to apply a label like that, because if they do so inappropriately, that is dangerous, as plaintiff's experts testified. In this case, there was ultimately a learning disability. Thank you, counsel. Thank you, Your Honor. Anything further, Ms. Graves? Yes. Your Honors, this is obviously the last chance for individual justice in this case. I hope that you will read the district court decision carefully and check the citations in the district's briefing. The statement by district counsel was full of legal and factual errors. There are many more requirements. I just have a factual question. What's his status now? He's a freshman in high school. Is he a freshman, or is he just getting all these assessments? The assessments were in 2014. He spent, I believe, three years at a therapeutic day school. He did quite well there for a while. Then he really wanted to be back in his neighborhood school, not his own neighborhood school, but a nearby school where he wouldn't have such a commute. Whether he was provided a free appropriate public education was absolutely not litigated in this case. It was settled, and he spent three years at a private therapeutic day school. There was no adjudication. Who paid for that? What? Who paid for that? CPS, Chicago Public Schools, under a settlement agreement that was reached because the students was able to get assessments that would have served as what the Supreme Court calls firepower in hearing and that served in leverage and settlement negotiations. There was ample evidence of ADHD. He was in, I believe, the 99th percentile in a standardized test for ADHD. The school psychologist said she thought it was depression. I really wish you would use words. I'm sorry. But your time has expired. Thank you very much. The case is taken under advisement.